**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NIKOLAS PAUL SHANK, | Case No. CV 16-0444 (SS) |
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | |
| Defendant. | |

**I.**

**INTRODUCTION**

Nikolas P. Shank ("Plaintiff") brings this action seeking to reverse the decision of the Commissioner of the Social Security Administration ("Commissioner" or "Agency") denying his application for disability benefits. The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the Court AFFIRMS the Commissioner's decision.

//

## PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income ("SSI") on December 6, 2011. (Administrative Record ("AR") 235). Plaintiff alleged that he became unable to work as of July 1, 2009, (AR 235), due to bipolar disorder, post-traumatic stress disorder, social phobia, and a history of shoulder surgery. (AR 136). The Agency denied the application initially on March 8, 2012, and on reconsideration on June 12, 2012. (AR 136-40, 146-51). On August 15, 2012, Plaintiff requested a hearing, (AR 152-54), which Administrative Law Judge ("ALJ") Catherine R. Lazuran conducted on February 11, 2014. (AR 46). The ALJ issued an unfavorable decision on May 29, 2014, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 25-39). Plaintiff requested review of the ALJ's decision on May 29, 2014, which the Appeals Council denied on November 16, 2015. (AR 1-3). The ALJ's determination then became the final decision of the Commissioner. (AR 1). Plaintiff filed this action on January 20, 2016. (Dkt. No. 1).

## III.

## FACTUAL BACKGROUND

Plaintiff was born on October 4, 1985. (AR 50, 235). Plaintiff is a high school graduate, attended San Francisco Community College from 2007 to 2010, and is fourteen units away from obtaining an associate's degree in sound recording. (AR 51,

55, 84). Prior to the onset date of his alleged disability, Plaintiff worked as a busboy, audio technician, food server, cashier, barista, and salesperson. (AR 52-61). Plaintiff maintains that he suffers from bipolar disorder, depression, anxiety, insomnia, attention deficit disorder ("ADD"), and substance addiction in remission. (AR 33, 62-64, 69).

## A.    Plaintiff's Relevant Mental Health History

### 1.    Donald H. Stanford, M.D.

Dr. Donald H. Stanford was Plaintiff's treating psychiatrist from March 2009 to May 2010. (AR 305-10). Dr. Stanford met with Plaintiff thirteen times and diagnosed Plaintiff with bipolar disorder, ADD, anxiety, and depressive disorder NOS. (AR 426).

Dr. Stanford's clinical notes describe Plaintiff's medications and their side effects. (AR 306-07, 309, 310). On initial consultation, Dr. Stanford reported that Plaintiff "just want[ed] anxiety med[ication]s." (AR 305). On March 16, 2009, Dr. Stanford prescribed Clonazepam to be taken at the dose of one milligram per day. Plaintiff over-consumed the medication, using the entire month's prescription in ten days. (AR 306). On April 15, 2009, Plaintiff requested more anti-anxiety medicine because he "need[ed] something to calm his N[erves]" and "want[ed] immediate relief." Dr. Stanford noted that Plaintiff "uses" marijuana. On April 29, 2009, Dr. Stanford "again" counseled Plaintiff to limit his Clonazepam intake. (AR 307).

Dr. Stanford's treatment notes indicate that Plaintiff "does live sound w[or]k," "set up for bands" as a freelance audio engineer, and "promo music on line." (AR 305-07; but see AR 309 ("rare[ly]" earns money freelancing)). Dr. Stanford indicated that Plaintiff was attending community college and served as a volunteer tutor in software and sound recording at the YMCA. (AR 309). Plaintiff had friends, (AR 305), was busy, and reported his "life [wa]s go[ing] well," (AR 307). Dr. Stanford opined that Plaintiff "seems . . . stable." (AR 309).

### 2. Cottage Hospital

Plaintiff was admitted to Cottage Health System on July 9, 2011, for the chief complaint of "detoxing for a few weeks, extreme insomnia, PTSD, and bipolar phase II." (AR 316-23). In January 2012, Plaintiff was admitted to Cottage Hospital's residential treatment center for "increased mood lability" in a manic state. Doctors diagnosed Plaintiff with bipolar I disorder and assigned a global assessment of functioning ("GAF") score of 65. (AR 352). While in the facility, Plaintiff "deflected & denied & refused additional medications." Plaintiff participated in the program for twenty-two days, but was "referred on for additional psychiatric tx [treatment] as [the hospital] felt th[e] facility did not provide sufficient containment." (AR 354).

///
///
///
///

### 3. Terrance Early, M.D.

Plaintiff began seeing Dr. Terrance Early, M.D., in July 2011. (AR 316-23). Dr. Early was Plaintiff's treating physician from August 1, 2011, through December 6, 2011, and began treating him again on April 9, 2013. Dr. Early treated Plaintiff once a month until Plaintiff moved to San Francisco in December 2013. (AR 458; AR 428-53).

On August 1, 2011, Dr. Early diagnosed Plaintiff with major depressive disorder "vs" bipolar disorder mixed type, social phobia, and ADD and assessed a GAF score of 55. (AR 453, 458). Dr. Early noted that "[Plaintiff] will consent only to above meds. Refuses antipsychotics/mood stabilizers." (AR 453). Plaintiff reported that Hell's Angels had "threatened to kill him" and "hack[ed] into his facebook account." Plaintiff was "doing fantastic on current meds." (AR 452). Plaintiff was "talkative, with good hygiene," and without hallucinations or delusions. Dr. Early assessed Plaintiff's mood as "[n]o depression whatsoever" and his affect as euthymic. Dr. Early reported that Plaintiff's father, Dr. Paul Shank, stated that Plaintiff is paranoid and "that the Hell's Angels are not against/out to get him," and Plaintiff "is lying about current symptoms, and may be manic and paranoid." (AR 453).

On August 21, 2011, Dr. Early noted that Plaintiff requested a refill of Klonopin. Dr. Early had prescribed 60 milligrams of Klonopin one week prior and reported that he was concerned about

"the potential for over use of Klonopin." Dr. Early advised Plaintiff that using more medication than prescribed had the risk of inducing seizures upon withdrawal. Dr. Early prescribed 60 one-milligram tablets not to be refilled prior to two weeks. (AR 451).

On September 26, 2011, Dr. Early's mental status examination assessed Plaintiff as tearful, anxious, and depressed. Dr. Early characterized the symptoms as "mixed." Dr. Early noted that Plaintiff had consumed a one-month prescription of anxiety medication in two weeks. (AR 450).

On October 18, 2011, Dr. Early informed Plaintiff that he was escalating his Klonopin dose to a level that would produce a risk of seizures upon withdrawal. Dr. Early assessed Plaintiff as having a "good" mood and "euthymic" affect. (AR 449).

On November 2, 2011, Dr. Early noted that Plaintiff was "doing better overall." (AR 448). Dr. Early assessed a low mood and slightly depressed affect. (AR 447).

On December 6, 2011, Plaintiff reported irritability, periods of good mood and then irritability, and no opiate use for eight months. (AR 446). Dr. Early assessed Plaintiff's general appearance and behavior as mildly irritable and his affect as momentarily tearful. (AR 446).

Plaintiff stopped seeing Dr. Early in December 2011, and began to see him again in April 2013. (AR 382, 329-30; AR 445). Dr.

Early noted during Plaintiff's April 9, 2013, session that Plaintiff "had pretty severe social anxiety, which ha[s] been improved with [K]lonopin." (AR 445). Dr. Early assessed Plaintiff as tearful and depressed. (AR 445).

On April 25, 2013, Dr. Early noted that Plaintiff was calm and insightful and had a "good" mood and euthymic affect. (AR 444). On May 22, 2013, Plaintiff had "a bit more anxiety," but Dr. Early concluded that Plaintiff was "[d]oing well." (AR 443). On June 1, 2013, Plaintiff reported, "I'm definitely happy." Plaintiff also reported irritability upon missing a dose of his subutex and social anxiety that was "less overall." (AR 442).

On July 13, 2013, Plaintiff denied depression and mood swings and reported that his social phobia was "not too bad." Dr. Early assessed Plaintiff's mood also as "[n]ot too bad" and his affect as anxious and dysphoric. Dr. Early opined that Plaintiff's bipolar disorder was in "fair" control. (AR 441). On July 27, 2013, Dr. Early noted a euthymic affect and "good" mood. (AR 440).

On August 6, 2013, Dr. Early assessed Plaintiff with a "somewhat low" mood and an anxious and depressed affect. He also, however, characterized Plaintiff's general appearance and behavior as motivated and open. (AR 439). On August 31, 2013, Dr. Early noted that Plaintiff had been rationing his Klonopin due to overconsumption and was trying to taper it back in anticipation of a move to San Francisco. Plaintiff had been using medical marijuana for plantar fasciitis and nausea. Dr. Early noted that Plaintiff

7

was "still battl[ing] anxiety and social isolation." On mental status examination, Dr. Early assessed Plaintiff's general appearance and behavior as "a bit anxious," his mood as "[p]retty good," and his affect as "anxious but optimistic." (AR 437).

On September 10, 2013, Plaintiff was depressed and had been so for about a week. (AR 436). Early noted Plaintiff was anxious and near tears, his mood was low, and his affect was depressed. (AR 436). On September 14, 2013, Plaintiff stated he was irritable and had argued with his father. Dr. Early noted that Plaintiff's mood was "fantastic" and his affect was euthymic. (AR 435). On September 21, 2013, Plaintiff reported waking feeling "horribly depressed" but then noted he "feels better today." Dr. Early opined that Plaintiff was under stress due to his potential move. Plaintiff reported a mild degree of mania. Dr. Early characterized Plaintiff's mood as "better." (AR 434).

On October 5, 2013, Plaintiff reported feeling "happy." Dr. Early noted a euthymic affect, "[p]retty good" mood, and "improved" bipolar depression. (AR 432). On October 23, 2013, Dr. Early reported that Plaintiff's therapist indicated Plaintiff might be a "little manic." Plaintiff reported taking too much Valium. Plaintiff had a mild increased rate of speech and elevated mood, which might have been attributable to his new puppy. (AR 430).

On November 7, 2013, Plaintiff reported that he had been a "little manic." Dr. Early noted that Plaintiff's mood was "good" and his affect was euthymic. (AR 429).

On December 6, 2013, Dr. Early indicated Plaintiff was "doing well" and his mood was "good." Plaintiff reported that his social phobia was "still an issue, but he [wa]s working on it." (AR 428).

**4.   Deborah DiGiaro, Ph.D.**

Examining consultative psychologist Dr. Deborah DiGiaro examined Plaintiff on February 19, 2012. (AR 381-85). Dr. DiGiaro noted that Plaintiff was neatly and casually dressed, showed "some psychomotor slowing," but there was "no evidence of delusions, hallucinations, paranoia, ideas of reference, [or] thought broadcasting." (AR 383-84). Dr. DiGiaro assessed Plaintiff with a GAF score of 55. (AR 385).

Dr. DiGiaro opined in her functional capacity assessment that Plaintiff is able to perform simple and repetitive tasks; accept instructions from supervisors; and interact with coworkers and the public. Dr. DiGiaro further declared Plaintiff "moderately" impaired in maintaining regular attendance at work, completing a normal workday/work week without interruptions from a psychiatric condition, and performing work activities on a consistent basis. (AR 385).

**5.   Dr. Pedro Guimaraes, M.D.**

Plaintiff was treated by Dr. Pedro Guimaraes from February 2012 through January 2013. (AR 66). On February 10, 2012, Plaintiff reported doing well since starting treatment at Cottage

Hospital.  (AR 404).  Dr. Guimaraes noted that Plaintiff was well-groomed and his attention and memory were normal.  Dr. Guimaraes further reported, however, that Plaintiff's mood was anxious, his thought process was racing, and his thought content was delusional in a persecutory manner.  (AR 405).  Dr. Guimaraes assessed a GAF score of 60.  (AR 406).

During subsequent visits, Dr. Guimaraes reported that Plaintiff responded well to treatment and assessed Plaintiff with higher GAF scores between 70 and 80.  On March 23, 2012, Dr. Guimaraes noted under "subjective" that Plaintiff was "doing very well on current tx [treatment]."  Dr. Guimaraes assessed Plaintiff's attention and memory as "[g]ood" and his mood as euthymic.  (AR 401).

On April 20, 2012, Plaintiff reported his mood was "good aside from anx[iety]."  (AR 403).  Dr. Guimaraes assessed Plaintiff's attention and memory as "[g]ood," noted that Plaintiff was "[r]esponding well to current tx [treatment]," and assigned a current GAF score of 78 (noting a past GAF score from the last year of 78).  (AR 403).

On May 11, 2012, Plaintiff reported, "'I just feel good.'"  Dr. Guimaraes assessed Plaintiff's attention and memory as "[g]ood," assigned a GAF score of 75, and noted that Plaintiff was "[r]esponding well to current tx [treatment]."  Dr. Guimaraes, however, indicated that Plaintiff's mood was intermittently depressed.  (AR 402).

On July 20, 2012, Plaintiff reported having "some anxiety," and Dr. Guimaraes assessed Plaintiff's attention as fair, his memory as good, and his mood as anxious. Dr. Guimaraes nonetheless assigned a GAF score of 75. (AR 417).

On August 3, 2012, Plaintiff reported "doing well" and Dr. Guimaraes opined that "this is the best he had been doing in awhile." Plaintiff had "[g]ood" memory/attention, a euthymic mood, and a GAF score of 80. (AR 416). On August 31, 2012, Plaintiff reported "feeling well." Dr. Guimaraes assessed Plaintiff's mood as anxious but nonetheless assigned a GAF score of 70. (AR 415).

On October 16, 2012, Plaintiff reported he was "doing well." Dr. Guimaraes noted "[g]ood" memory and attention and a GAF score of 70. (AR 414).

On January 28, 2013, Plaintiff reported "doing well overal[l]." Dr. Guimaraes noted that Plaintiff was neither depressed nor anxious and assigned a GAF score of 75. He also opined that Plaintiff was showing signs of improvement. (AR 412).

B.   **Plaintiff's Relevant Testimony**

In 2011, Plaintiff served food as a church volunteer for several weeks. (AR 61). Plaintiff worked as a busboy and server in March 2010 for approximately three weeks prior to being terminated. (AR 52-54). From August 2008 through June 2009, Plaintiff was employed as a museum audiovisual technician for

approximately eight to twelve hours per week. (AR 52). For six months in 2008, Plaintiff worked between fifteen to thirty hours per week in the broadcasting electronics department of his community college assisting students with equipment rentals. (AR 56). For several months in 2006, Plaintiff was employed part-time in a temporary position as a server and cashier in a movie theater. (AR 54). Also in 2006, Plaintiff worked at a restaurant for approximately three to four months. (AR 56). For less than three months in 2005, Plaintiff worked approximately thirty hours per week as a barista. (AR 55). In 2003 and 2004, Plaintiff was employed at a ski shop approximately eighteen to twenty-five hours per week and left this position to relocate. (AR 58).

Plaintiff claims that, since the onset of his disability, he could not hold a simple job like a cashier because he "probably wouldn't have been reliable." (AR 77). Plaintiff also could not hold a job that involves simple two-step tasks because, due to his bipolar symptoms, he "would not be stable" and "would not be able to handle it. [He] would probably walk out or something [and] would just not comply." (AR 78).

Plaintiff, however, also testified that his health improved since the July 2009 alleged onset of his disability. (AR 62). The ALJ asked whether Dr. Guimaraes's opinion that Plaintiff was "doing really well" and improving was true, and Plaintiff testified that this "definitely" was true. (AR 66-67). Plaintiff explained that he was "sticking" to Dr. Guimaraes's prescribed medication regime and he was improving continuously. (AR 67). Plaintiff also

testified that while his bipolar disorder is not fully controlled, he is "getting to a point where [he is] able to handle [his] symptoms better." (AR 69). Plaintiff attributed the improvement in his health to his sobriety and a strict medication regime. (AR 62, 65, 67). Plaintiff conceded that his drug use had impeded his ability to work and "to just function in general." (AR 73).

The ALJ challenged Plaintiff's sobriety and his compliance with his physicians' prescribed medication regimens. The ALJ referred Plaintiff to January 2012 emergency room records noting opiate dependence and indicating that Plaintiff was in withdrawal. When the ALJ inquired whether Plaintiff had in fact used opiates, Plaintiff explained that he had had surgery in March 2011 and began taking opiate pain killers. (AR 63-64).

The ALJ also questioned Plaintiff regarding his admission to Cottage Hospital's drug rehabilitation treatment program in January 2012. Plaintiff conceded that he attended the program only for 22 days, leaving prior to the expiration of the program's 28-day standard stay. (AR 64-65, 71). According to Plaintiff, the program informed him that he was "too [bipolar]," he was not in treatment for addiction, and he should leave because he "wasn't like the other people" in the program. (AR 71). The ALJ pointed out that treatment records suggested that the facility discharged Plaintiff because he was not taking recommended medications. (AR 72; AR 73). The ALJ further noted that the program's first diagnosis was "polysubstance dependence," with secondary diagnoses of "[bipolar] one" and "anxiety NOS." (AR 72). Plaintiff insisted that it was

13

"no[t] true at all" that the facility discharged him for noncompliance. (AR 72, 65).

Plaintiff testified that he "tr[ies] to do as many chores as [he] can." (AR 73). He "tr[ies]" to wash his clothes, do the dishes, keep things organized, and work out. (AR 73, 74). Plaintiff also cooks frozen meals in a pan or the oven, buys groceries independently, and takes his dog on one-hour walks three times a day. (AR 74, 82). Plaintiff attended at least 32 Alcoholics Anonymous meetings between 2009 and January 2012. (AR 75). Plaintiff also worked as a volunteer for a total of sixteen to twenty hours over a two-week period in 2011. (AR 82). Plaintiff has a hard time concentrating and cannot enjoy simple hobbies. While he does watch television, he has difficulty enjoying it because he lacks focus. Plaintiff does not spent time reading because he cannot focus. (AR 76).

Plaintiff testified that he has friends and they sometimes come over to visit. (AR 75, 81). Plaintiff uses a computer for a couple of hours a day to check e-mail and communicate with friends and family through social media. (AR 76, 81). Although his computer is on for several hours a day, he uses it only periodically to check, respond to, and write messages. (AR 81). Plaintiff uses public transit in San Francisco "almost every day." (AR 77). Plaintiff also writes lyrical prose approximately three days a week for about five hours total. Plaintiff does not write as much as he would like or up to "par" "with [his] abilities." (AR 76; AR 80 (would like to be writing "all day every day")). Plaintiff

began writing a screenplay but has not finished it. (AR 76).
Plaintiff's day revolves around taking care of his puppy and
himself. (AR 84).

**C.   Lay Witness Testimony**

Plaintiff's mother, Janice Lloyd, completed a third-party
function report, (AR 258-71), conceding that Plaintiff can bathe,
shave, eat, and use the restroom, but "never without his
medications." Plaintiff will wash dishes and tidy his room but
only when on his medication. Plaintiff independently prepares his
own ready-made meals, takes his dog for walks, and sometimes goes
to the library. (AR 259-60, 262). Plaintiff does not have a
regular social life or own a car, and he is "not very good with
money." He does, however, use public transportation and shops for
groceries. (AR 261-62).

According to Ms. Lloyd, Plaintiff can be manic, which makes
it difficult for him to get along with family and friends. He also
does not always complete projects, has trouble concentrating and
focusing, and can only pay attention for approximately ten minutes
(or more if on medication). Plaintiff cannot follow instructions
very well and "jump[s] ahead and misinterpret[s] instructions."
(AR 263). Plaintiff is unreliable to work with, not punctual, does
not handle stress or changes in routine well, and is unable to
"hold down a job." (AR 264).

Plaintiff's father, Dr. Paul Shank, submitted a letter stating that Plaintiff has an inability to socialize and retain relationships; does not interact well even with family; has extreme fear – not based in reality – of being followed by Hell's Angels, drug dealers and others; has a phobia about the way he interacts with people; has extreme situational anxiety at the slightest interaction; and barrages strangers inappropriately with expletives. (AR 454).

Plaintiff's therapist, Eti Valdez-Kaminsky, MFT, completed a psychiatric medical source statement assessing Plaintiff's functioning. Valdez-Kaminsky assessed marked restrictions in Plaintiff's daily and social activities; maintaining concentration, persistence, and pace; dealing with the public; understanding, remembering, following, and carrying out complex instructions; behaving in an emotionally stable manner; and relating predictably in social situations. (AR 455-57). Valdez-Kaminsky assessed a GAF score of 44. (AR 455).

Plaintiff's brother-in-law, Paul Gerding, Jr., submitted a letter. Mr. Gerding stated that Plaintiff has outbursts, sometimes could not get out of bed, has great trouble organizing and remembering the demands of life on a day-to-day basis. (AR 292-94).
///
///
///
///

Plaintiff's family friend, Deborah Heil, opined in a January 14, 2014, e-mail that Plaintiff is forgetful, distractible, and sometimes nervous; is socially withdrawn; suffers from odd thinking; has difficulty making and keeping friends and lacks a solid peer ground; has different moods, anger outbursts, and illogical rants; is intolerant of others; and has poor concentration. (AR 291).

**D.   Adult Function and Disability Reports**

Dr. Early completed a medical source statement on February 6, 2014. (AR 458-61). Dr. Early assessed a GAF of 50 and opined that Plaintiff would not be able to perform simple, one- or two-step tasks, maintain productivity, or stay on task over the course of an eight-hour day. (AR 460). Dr. Early also noted that Plaintiff is limited in the amount of work stress he can tolerate, is unable to adapt to changes in routine, is not reliable in attending appointments, and would likely miss more than four days of work per month. (AR 459-60). Dr. Early further opined that Plaintiff's mental illness would interfere with his ability to focus or concentrate for a two-hour period by between 30 to 90 percent. (AR 459). Dr. Early opined that Plaintiff's substance abuse disorder did not interfere with his ability to perform work because Plaintiff was stable on suboxone. (AR 460).

///

///

///

///

Dr. Early also assessed Plaintiff's functional limitations due to mental illness – by way of a check-the-box medical source statement – as a 25 percent loss of sustained function in following work rules, interacting with a supervisor, maintaining attention/concentration, responding to work changes, and following simple instructions; a 50 percent loss of function in relating to co-workers, functioning independently, and setting limits and standards; a 100 percent loss of function in dealing with the public, demonstrating reliability in attendance/work, following complex or detailed instructions, using judgement, directing activities, completing tasks, attending work on a daily basis, behaving in an emotionally stable manner, and relating predictably in social situations; and between a 25 and 100 percent loss of function in caring for himself and using public transportation. (AR 459).

On August 31, 2013, Dr. DiGiaro completed a functional capacity assessment and opined that Plaintiff is able to perform simple and repetitive tasks; accept instructions from supervisors; and interact with coworkers and the public. Dr. DiGiaro further declared Plaintiff moderately impaired in maintaining regular attendance at work; completing a normal workday/work week without interruptions from a psychiatric condition; and performing work activities on a consistent basis. (AR 385).

In a letter dated June 10, 2013, Dr. Stanford provided a narrative in support of Plaintiff's application for disability. Dr. Stanford reported that, over time, a "more definitive symptom

picture emerged" which indicated that Plaintiff is "psychiatrically disabled."  Dr. Stanford noted that Plaintiff's bipolar disorder results in erratic behavior, mood instability, poor impulse control, poor judgment, some degree of paranoia, and grandiosity. According to Dr. Stanford, Plaintiff "was never able to keep appointments" or "take medication consistently."  In addition, although Plaintiff attempted to work, his efforts "were just as erratic as his efforts to keep regular appointments with [Dr. Stanford]."  Dr. Stanford opined that Plaintiff's ADD "only makes it more difficult for him to function in a predictable and consistent manner and accomplish his goals."  (AR 426-27).

On September 25, 2012, Dr. Guimaraes filled out a check-the-box "MENTAL INTERROGATORIES" form opining that Plaintiff was "markedly" or "moderately" limited in various areas of performance relevant to a work setting.  (AR 407-10).  Dr. Early assessed a GAF score of 50 and reported that Plaintiff's highest score was 70.  (AR 410).

On June 5, 2012, Dr. R.E. Brooks, a non-examining reviewing physician, submitted a report regarding Plaintiff's functional capacity.  (AR 129-34).  Dr. Brooks opined that Plaintiff was not significantly limited in his ability to carry out short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual; work in coordination with or proximity to others without being distracted by them; and make
///
///

simple work-related decisions.  (AR 131-32).  Dr. Brooks further concluded that Plaintiff is not disabled although he would be limited to unskilled work because of his impairments.  (AR 133).

## IV.

### THE FIVE STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps include the following:

> (1) Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

> (2) Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3) Does the claimant's impairment meet or equal one on the list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.

(4) Is the claimant capable of performing his past work? If so, the claimant is found not disabled. If not, proceed to step five.

(5) Is the claimant able to do any other work? If not, the claimant is found disabled. If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1098-99); 20 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

In between steps three and four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 CFR 416.920(e). To determine the claimant's RFC, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 CFR § 416.1545(a)(2).

The claimant has the burden of proof at steps one through four and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54. "Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry." Id. at 954. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age,

education, and work experience.  <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the grids").  <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert.  <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

## V.

### THE ALJ'S DECISION

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (AR 30-39).  At the first step, the ALJ observed that Plaintiff had not engaged in substantial gainful activity since his application for benefits date of December 6, 2011.  (AR 30).  At step two, the ALJ found that Plaintiff was impaired by bipolar disorder, anxiety, social phobia, ADD, and drug abuse.  (AR 30).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart Part P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925-26).  (AR 30-31).

1    The ALJ then found that Plaintiff possessed the RFC to perform
2    a full range of work at all exertional levels but with the following
3    nonexertional limitations:  Plaintiff "can do simple, routine,
4    repetitive tasks and some detailed ones, not involving work with
5    the public," and "can do work involving a low level of pressure in
6    terms of strict deadlines."  (AR 31).

7

8    At step four, the ALJ determined that Plaintiff would be
9    unable to perform his past relevant work as a busboy, audio
10   technician, service worker, cook, salesperson, and cashier.  (AR
11   37).  Finally, at step five, the ALJ concluded that, based on
12   Plaintiff's RFC, age, education, and work experience, there are
13   jobs that exist in significant numbers in the national economy that
14   Plaintiff could perform.  (AR 37-38).  According to the vocational
15   expert, Plaintiff was able to perform the requirements of
16   representative occupations such as yard worker and farm worker.
17   (AR 38).  Therefore, the ALJ concluded that Plaintiff was not under
18   a disability, as defined by 20 C.F.R. § 416.920(g), since the date
19   of his application for benefits.  (AR 38).
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

23

# VI.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." Auckland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F. 3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Auckland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

Plaintiff asserts five claims.  First, Plaintiff contends that the ALJ improperly evaluated the treating and examining physicians' opinions.  Second, Plaintiff maintains that the ALJ erroneously discounted Plaintiff's credibility.  Third, Plaintiff argues that the ALJ improperly evaluated the lay witness statements.  Fourth, Plaintiff asserts that the ALJ erred in assessing Plaintiff's RFC. Fifth, Plaintiff claims that the ALJ erred at step five by giving an incomplete hypothetical to the vocational expert.  Plaintiff's Mem. In Supp. of Compl. ("Pl's Mem.") at 2).  For the reasons discussed below, the Court AFFIRMS the ALJ's decision.

**A.   The ALJ Did Not Err In Evaluating The Opinions Of Plaintiff's Treating And Examining Physicians**

Plaintiff asserts that the ALJ erred by failing to evaluate Dr. Stanford's opinion at all and by according insufficient weight to the opinions of Drs. Early, DiGiaro, and Brooks.  (Pl's Mem. at 2).  The Court disagrees.

There are three types of medical opinions in social security cases:  The opinions of (1) treating physicians, who examine and treat, (2) examining physicians, who examine but do not treat, and (3) non-examining physicians who neither examine nor treat. Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009).  Treating physicians are given the greatest weight because

they are "employed to cure and [have] a greater opportunity to know and observe the patient as an individual." <u>Magallanes v. Bowen</u>, 881 F.3d 747, 751 (9th Cir. 1989). Accordingly, where a treating physician's opinion is refuted by another doctor, the ALJ may not reject this opinion without providing specific and legitimate reasons supported by substantial evidence in the record. <u>Lester v. Chater</u>, 81 F.3d 821, 830-31 (9th Cir. 1995) (ALJ must provided clear and convincing reasons for rejecting an unrefuted treating physician's opinions); <u>see also</u> <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008).

Similarly, the Commissioner may reject the controverted opinion of an examining consultative physician only for "specific and legitimate reasons that are supported by substantial evidence." <u>Carmickle v. Comm'r of Social Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (quoting <u>Lester</u>, 81 F.3d at 830-31). When the opinion of a consultative examining physician contradicts that of a treating physician, the opinion of the nontreating source may be substantial evidence. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995). "It is then solely the province of the ALJ to resolve the conflict." <u>Id.</u>

The opinion of a non-examining, non-treating physician does not constitute substantial evidence to justify rejecting the opinion of either an examining or a treating physician unless it is consistent with and supported by other evidence in record. <u>Lester</u>, 81 F.3d at 831; <u>Morgan v. Comm'r of Soc. Sec.</u>, 169 F.3d

595, 600-01 (9th Cir. 1998).  An ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by the clinical findings.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); see also Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1195 (9th Cir. 2004).

## 1. The ALJ's Failure To Consider Dr. Stanford's Opinion's Was Harmless

Plaintiff contends that the ALJ's failure to mention and weigh the opinion of his treating physician Dr. Stanford constitutes reversible error.  (Pl's Mem. at 3).  The Court disagrees.

Admittedly, the failure to mention a treating physician's opinion is error.  Marsh v. Colvin, 792 F.3d 1170, 1172-73 (9th Cir. 2015) (ALJ erred by not mentioning treating physician's opinion; "[b]ecause a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them") (citation omitted); Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) ("Where an ALJ does not explicitly reject a medical opinion . . . he errs.").  The error here, however, does not require remand because it is harmless.  "A decision of the ALJ

///

///

///

will not be reversed for errors that are harmless." <u>Burch v.</u>
<u>Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005); <u>see</u> <u>Marsh</u>, 792 F.3d
at 1173 (harmless error analysis applies to an ALJ's failure to
mention a treating physician's opinion).

"ALJ errors in social security cases are harmless if they are
'inconsequential to the ultimate nondisability determination,'"
<u>Marsh</u>, 792 F.3d at 1172-73 (quoting <u>Stout</u>, 454 F.3d at 1055-56).
"'[A] reviewing court cannot consider [an] error harmless unless
it can confidently conclude that no reasonable ALJ, when fully
crediting the testimony, could have reached a different disability
determination.'" <u>Id.</u> (quoting <u>Stout v. Commissioner</u>, 454 F.3d
1050, 1055-56 (9th Cir. 2006)). "'[W]here the circumstances of
the case show a substantial likelihood of prejudice, remand is
appropriate so that the agency can decide whether re-consideration
is necessary. By contrast, where harmlessness is clear and not a
borderline question, remand for reconsideration is not
appropriate.'" <u>Id.</u> (quoting <u>McLeod</u>, 640 F.3d at 888) (internal
quotation marks omitted).

Plaintiff asserts in conclusory form, and with no citation to
record support, that Dr. Stanford's opinions concerned the "nature
and severity of plaintiff's impairments made in functional terms
applicable to determining disability." (Pl's Mem. at 3 (citing 20
C.F.R. § 404.1527(a)(2))). Dr. Stanford's opinions, however, do
not contain a functional assessment of Plaintiff's limitations.
While Dr. Stanford opines that over time a "more definitive symptom
picture emerged" indicating that Plaintiff is "psychiatrically

disabled" as a result of his mental disorders, (AR 426), the existence of a psychiatric illness, as identified by a doctor, is not dispositive of a disability under the Social Security Act.

Moreover, Dr. Stanford's letter describes Plaintiff's bipolar symptoms as erratic behavior, mood instability, poor impulse control/judgment, paranoia, and grandiosity, (AR 426), and his treatment notes identify Plaintiff's medications and side effects as well as reference his school attendance and freelance work. (AR 305-07, 309). He further opined that Plaintiff's ADD made it more difficult for Plaintiff to function in a predictable manner. (AR 426-27). However, Dr. Stanford's opinion contains no functional assessment of Plaintiff's limitations. These descriptions – absent an opinion regarding their impact on Plaintiff's work-related functioning – are not indicative of an inability to work and would not have altered the ALJ's final decision.

The error also was harmless because Dr. Stanford's opinion is contradicted by other evidence in the record, including Plaintiff's activities, his conservative and effective treatment, the objective medical evidence, and the opinions of Drs. DiGiaro and Brooks. See infra § VII.A.2.b, B.1, B.3, B.4. Plaintiff further testified that since his alleged disability onset he has been "doing really well," his health is improving and his improvement has been continuing. (AR 66-67; see also AR 69 (while his bi-polar disorder is not fully controlled, he is "getting to a point where [he is] able to handle [his] symptoms better").

Finally, Dr. Stanford's opinion fails to consider the impact of Plaintiff's substance abuse on his functioning. Plaintiff was overusing his Klonopin and using marijuana during his treatment with Dr. Stanford. (AR 306-07). Despite claims of improved health since July 2009 due to sobriety, (AR 62, 65, 67), Plaintiff was abusing opiates in early 2011, (AR 446; 63-64), detoxing in July 2011, (AR 316-23), and in a substance abuse rehabilitation program in January 2012. (AR 352). Plaintiff concedes that his drug use impeded his ability to work and "to just function in general." (AR 73). Yet, Dr. Stanford failed to consider how overuse of medication and other substances impeded Plaintiff's functioning in a work setting.

For these reasons, based on the evidence in the record as a whole, any failure to consider Dr. Stanford's opinion was harmless. Thus, remand is not required.

## 2. The ALJ Provided Specific And Legitimate Reasons To Discount Dr. Early's Opinion

Plaintiff contends that the ALJ erred by giving too little weight to Dr. Early's opinion. (Pl's Mem. at 2, 13). Dr. Early opined that Plaintiff would not be able to perform simple tasks, maintain productivity, or stay on task throughout a full workday. (AR 460). He further concluded that Plaintiff is limited in tolerating stress, unable to adapt to changes in routine, unreliable, and likely to miss more than four work days per month. (AR 459-60). He opined that Plaintiff's mental illness would

impair his ability to focus for a two-hour period. (AR 459). He additionally opined that Plaintiff had a 25 percent loss of sustained function in following work rules, interacting with a supervisor, maintaining attention/concentration, responding to work changes, and following simple instructions; a 50 percent loss of function in relating to co-workers, functioning independently, and setting limits and standards; a 100 percent loss of function in dealing with the public, demonstrating reliability in attendance/work, following complex or detailed instructions, using judgement, directing activities, completing tasks, attending work on a daily basis, behaving in an emotionally stable manner, and relating predictably in social situations; and between a 25 and 100 percent loss of function in caring for himself and using public transportation. (AR 459).

The ALJ characterized Dr. Early's opinion as "essentially opin[ing] that [Plaintiff] is unable to work." (AR 36). The ALJ discounted the opinion on three grounds: (1) the opinion was based largely on Plaintiff's subjective allegations that the ALJ deemed were "not very credible"; (2) it was inconsistent with Plaintiff's daily activities; and (3) the consultative psychologist's opinion was "more objective and more consistent with the record as a whole." (AR 36). These reasons are specific and legitimate.

///
///
///
///
///

### a. Opinion Premised Largely On Plaintiff's Discredited Subjective Complaints

An ALJ may disregard a treating opinion if the opinion relies heavily on a patient's descriptions of his symptoms and the ALJ properly has determined that the patient's statements are not credible. Andrews, 53 F.3d at 1043; Turner v. Comm's of Soc. Sec., 613 F.3d 1217, 1223 (9th Cir. 2010). Plaintiff claims that Dr. Early based his findings on his own mental status examinations documenting mood swings, rapid speech, grandiosity, depressed mood, and euthymic (positive) affect and on Plaintiff's response to medications. (Pl's Mem. at 13). That Plaintiff had mood swings and rapid speech, however, says little about the severity of his work-related functioning. Rather, Plaintiff's subjective statements, and not Dr. Early's mental status examinations, largely formed the basis for Dr. Early's opinion that Plaintiff was "essentially . . . unable to work." (AR 36).

Because the ALJ properly found Plaintiff to be not fully credible, see infra § VII.B, and Dr. Early's opinions largely were based on these discredited statements, the ALJ did not err in giving little to no weight to Dr. Early's opinion.

### b. Opinion Inconsistent With Plaintiff's Activities

The ALJ also properly relied on Plaintiff's daily activities to discount Dr. Early's opinion. (AR 36). The ALJ characterized Plaintiff's daily activity level as "fairly normal" and "not as

limited as one would expect from an individual with debilitating symptoms." (AR 33, 34). The ALJ opined that "some of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." (AR 34). The ALJ identified Plaintiff's activities as volunteer work at a church, looking for work, doing household chores, cooking, shopping, going to the gym at times, attending AA meetings, traveling to Oregon for a wedding in August 2013, using a computer daily for a few hours, writing prose, doing laundry, and using public transportation, maintaining friendships, and walking his dog. (AR 32, 33). The ALJ noted that "[t]here is no indication that [Plaintiff] cannot use public transit on his own or shop on his own." (AR 36).

The ALJ's characterization of Plaintiff's daily activities as inconsistent with Dr. Early's opinions is supported by substantial evidence. While Plaintiff contends that he only "tried" to do as many chores as he could, used the bus "occasionally to go grocery shopping,"[1] and worked as a volunteer for only a brief, two-week period, (Pl's Mem. at 14), the Court must weigh the evidence as a whole and affirm the ALJ's decision where the evidence is susceptible to more than one rational interpretation. Burch, 400 F.3d at 680-81.

---

[1] Although Plaintiff testified that he used the bus "occasionally" for the specific purpose of going grocery shopping, he testified more generally that he uses public transportation "almost every day." (AR 77).

Weighing the evidence as a whole, Plaintiff's activities were inconsistent with Dr. Early's opinions. Cf. Reddick, 157 F.3d at 720 (citations omitted). Dr. Early opined, for example, that Plaintiff has between a 15 and 50 percent loss of function in his ability to use public transportation alone and care for his personal grooming and hygiene. (AR 459). Yet, Plaintiff testified to the opposite. Plaintiff confirmed that he dresses and grooms himself without assistance. (AR 73). He also uses public transportation independently on a daily basis. (AR 77). Plaintiff's mother confirmed that Plaintiff dresses and grooms himself and uses public transportation alone. (AR 259, 261).

Similarly, while Dr. Early opined that Plaintiff cannot maintain a clean residence, (AR 459), Plaintiff's testimony is inconsistent with this conclusion. Plaintiff "tr[ies] to do as many chores as [he] can," including washing his clothes and dishes and keeping things organized. (AR 73, 674). Plaintiff did not suggest that his cleaning efforts were fruitless. Moreover, Plaintiff's mother confirmed that he will wash dishes and tidy his room provided he is on his medication. (AR 260).

Dr. Early opined that Plaintiff has a 25 percent loss of function in his ability to shop for groceries alone. (AR 459). Plaintiff's testimony, however, suggests otherwise. When asked whether he "has been going shopping for groceries" since July 2009, Plaintiff answered "yes" and provided no further limitation on his response. (AR 74). Plaintiff's mother confirmed that Plaintiff shops for groceries at times independently. (AR 261).

Dr. Early opined that Plaintiff has a 50 percent impairment in his ability to function independently. (AR 459). As discussed, however, Plaintiff dresses and grooms himself independently. He also works out and tries to stay healthy, spends his day caring for himself and his dog, cooks his meals in the oven or on the stovetop, tries to do as many chores as he can and to maintain organization, uses public transportation without assistance on almost a daily basis, takes his dog on long, one-hour walks three times a day, maintains friendships, and corresponds with friends and family by e-mail and social media. Plaintiff also attended 32 AA meetings from 2009 and January 2012, and attended four years of college from 2007 to 2010. (AR 51, 73-74, 76-77, 84). The breadth of these activities is inconsistent with a finding of a marked restriction on Plaintiff's ability to function independently.[2]

Dr. Early also opined that Plaintiff has a complete loss of function in the ability to deal with the public and relate predictably in social situations. These opinions are inconsistent

_____

[2] Plaintiff also testified that he "tr[ies]" to do as many chores as he can, has a hard time concentrating and cannot enjoy simple hobbies, has difficulty enjoying television because he lacks focus, cannot spend time reading due to his lack of focus, writes lyrical prose at a level not up to "par" "with his abilities" and writes only five hours a week instead of "all day every day" as he would like, has not finished his screenplay, and is fourteen credits shy of obtaining his associate's degree in sound recording. (AR 51, 76, 80). Loss of the ability to enjoy leisure activities, write lyrical prose, or complete college or a screenplay, however, is not persuasive evidence indicative of a general impairment in Plaintiff's ability to function independently. Nor is it indicative of a disability within the meaning of the Social Security Act. Moreover, when evidence is capable of more than one rational interpretation, the Court must uphold the ALJ's decision. Birch, 400 F.3d at 680-81.

with Plaintiff's testimony. Plaintiff confirmed that he has friends and corresponds daily with others through e-mail and social media. These contacts are inconsistent with a complete restriction in the areas of dealing with the public and relating predictably in social situations. (AR 75, 81).

For these reasons, Plaintiff's inconsistent activities constituted a legitimate and specific reason to discount Dr. Early's opinion. Remand is not warranted.

### c. Dr. Early's Opinion Is Contradicted By Dr. DiGiaro's Opinion

The ALJ properly relied on the opinion of the consultative psychologist, Dr. DiGiaro, to discount Dr. Early's opinion. (AR 36). The ALJ declared Dr. DiGiaro's finding that Plaintiff is able to perform simple and repetitive tasks "more objective and more consistent with the record as a whole." (AR 36, 385).

When the opinion of a consultative examining physician contradicts that of a treating physician, the opinion of the nontreating source may be substantial evidence. Andrews, 53 F.3d at 1041. "It is then solely the province of the ALJ to resolve the conflict." Id. The ALJ's conclusion that Dr. DiGiaro's opinion was more objective and consistent than Dr. Early's opinion was supported by substantial evidence.

As discussed, Plaintiff's activities do not support Dr. Early's functional assessments, supra § VII.A.2.b, but rather are more consistent with Dr. DiGiaro's assessment of Plaintiff's limitations. In addition, Plaintiff's physicians' notes primarily document Plaintiff's mood as "good" and affect as euthymic or "good." Infra § VII.A.2.b. They indicate repeatedly that Plaintiff is doing well, id., and Plaintiff confirmed at the hearing that he has improved since July 2009. Supra § III.B. Dr. DiGiaro's assessment also is more consistent with the medical evidence as a whole. Infra § VII.B.3, B.4. Substantial evidence thus supports the ALJ's conclusion that Dr. DiGiaro's opinion was more objective and consistent with the evidence in the record as a whole.

The ALJ provided specific and legitimate reasons supported by substantial evidence for rejecting Dr. Early's findings. The ALJ thus did not err by relying on Dr. DiGiaro's opinion to discount Dr. Early's treating opinion.

**3.    The ALJ Did Not Err By Failing To Recontact Dr. DiGiaro**

Plaintiff contends that the ALJ erred in evaluating the opinion of consultative examiner Dr. DiGiaro. (Pl's Mem. at 15). The ALJ noted that Dr. DiGiaro opined in her functional capacity assessment that Plaintiff is able to perform simple and repetitive tasks, accept instructions from supervisors, and interact with coworkers and the public. (AR 35; see also AR 385). Dr. DiGiaro further declared Plaintiff "moderately" impaired in maintaining

regular attendance at work, completing a normal workday/work week without interruptions from a psychiatric condition, and performing work activities on a consistent basis. (AR 35; see also AR 385). The ALJ gave Dr. DiGiaro's opinion "some weight" and relied on it to establish Plaintiff's functional limitations. (AR 35). The ALJ thereafter noted that she found Dr. DiGiaro's opinion "vague regarding what she means by 'moderate' limitations but [the ALJ] note[d] that the mental status examination was fairly good and the GAF of 55 indicates ability to do some sorts of work." (AR 35).

Plaintiff contends that because the ALJ declared "moderate" to be vague, the ALJ had a duty to "seek clarification from Dr. DiGiaro as to the definition of moderate." (Pl's Mem. at 15). The Commissioner will recontact medical sources only when the medical evidence "is inadequate" for the Commissioner to determine whether a claimant is disabled. 20 C.F.R. § 416.912(e). The Commissioner also will either seek additional evidence or clarification from the treating physician when a medical report contains a "conflict" or an "ambiguity" that must be resolved. 20 C.F.R. § 416.912(e)(1).

Here, the record was not inadequate and there were no conflicts or ambiguities that had to be resolved. While Plaintiff points out that the ALJ characterized "moderate" as "vague," this finding is not the equivalent of a finding that the record was inadequate. Nor did the ALJ make a specific finding of inadequacy.

Moreover, the ALJ had an adequate record to evaluate Dr. DiGiaro's opinion. The ALJ did not reject Dr. DiGiaro's findings

38

of moderate impairment.  Instead, the ALJ considered the doctor's findings as a whole and construed the opined moderate impairments in the context of a GAF of 55 and "fairly good" mental status examination.  (AR 35).  Based on this evaluation, the ALJ gave the opinion "some weight" and "rel[ied] on it regarding [Plaintiff's] functional limitations."  (AR 35).  The absence of a more specific definition of moderate did not preclude the ALJ from properly evaluating and relying upon Dr. DiGiaro's opinion.

Finally, although Plaintiff maintains that clarification was necessary to fully develop the record, Plaintiff does not contend that a more specific definition of "moderate" would prove that his functional impairment was worse.  Any claim that Dr. DiGiaro's explanation would have direct relevance to Plaintiff's disability claim, therefore, is speculative.  Mere conjecture or speculation that additional evidence might have been obtained and shown disabling impairments is insufficient to warrant a remand.

For these reasons, the ALJ's duty to develop the record was not triggered.  Cf. Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (only ambiguous evidence triggers the ALJ's duty to develop the record).  Remand is not required.

**4.    The ALJ Did Not Err By Relying On Dr. R.E. Brooks' Opinion**

The ALJ agreed with Dr. Brooks' opinion that Plaintiff can do simple and some detailed tasks but should not work with the public.  (AR 37).  Plaintiff argues that the opinion of a non-examining

physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining or treating physician. (Pl's Mem. at 16). The ALJ, however, did not rely on Dr. Brooks' opinion to reject the opinions of Plaintiff's treating or examining physicians.

Moreover, even if the ALJ relied on Dr. Brooks opinion, the opinion of a non-examining, non-treating physician can constitute substantial evidence when supported by other evidence in the record and consistent with that evidence. Salee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). The ALJ noted that both Plaintiff's activities and the record as a whole supported her agreement with Dr. Brooks' conclusions. (AR 37). The Court already has held that Plaintiff's activities are not consistent with the limitations assessed by Dr. Early or Plaintiff's subjective complaints of disabling symptoms. Supra § VII.A.2.b. Rather, these activities support Dr. Brooks' limitations. Thus, substantial evidence supports the ALJ's finding. Accordingly, remand is not required.

B.    **The ALJ Did Not Err In Rejecting Plaintiff's Credibility**

Plaintiff asserts that the ALJ erred by finding his statements not fully credible. (Pl's Mem. at 2). The Court disagrees.

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying

impairment "which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (internal quotation marks omitted). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (quoting Smolen, 80 F.3d at 1282). Second, if the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1281.

In assessing a claimant's testimony, the ALJ may consider the following factors: (1) inconsistent daily activities, Thomas, 278 F.3d at 958-59; (2) any inadequately or unexplained failure to pursue treatment or follow treatment, Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008); (3) conservative treatment, Parra v. Astrue, 481 F.3d 742, 750-51 (2007); and (4) "ordinary techniques of credibility evaluation." Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 (9th Cir. 2010) (internal quotations omitted). In addition, while it is improper for an ALJ to reject subjective testimony based "solely" on its inconsistencies with the objective medical evidence presented, Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (citing Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991)), an ALJ may consider such inconsistencies as one factor, among many, bearing on the credibility of a claimant's subjective testimony. See, e.g.,

41

Thomas, 278 F.3d at 958-60 (ALJ properly considered lack of objective medical evidence and other factors in evaluating credibility of subjective testimony regarding the severity of impairments and pain); Morgan v. Comm'r of Soc. Sec., 169 F.3d 595, 599-600 (9th Cir. 1999) (same).  If the ALJ finds the claimant's pain testimony not to be credible, the ALJ must make "findings . . . sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected [the] claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Rollins v. Massanari, 261 F.3d 853, 856-57 (9th Cir. 2001).

Here, the ALJ found Plaintiff's claims of disabling symptoms not entirely credible.  The ALJ noted that Plaintiff claimed that his bipolar disorder, ADD, post-traumatic stress disorder, and social phobia prevented him from working; his symptoms have worsened and he is less able to engage in activities; his right shoulder impairment limits his use of his right shoulder; he is not able to focus or concentrate; and he is less able to care for himself and his mother helps him.  The ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms."  The ALJ, however, found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible."  (AR 32).

///
///
///
///

The ALJ gave four reasons for finding Plaintiff's subjective complaints not credible: (1) inconsistent daily activities; (2) failure to comply with medical treatment; (3) conservative and effective treatment; and (4) the objective medical record. (AR 32-34). These reasons were specific, clear and convincing.[3]

## 1. Inconsistent Activities

The ALJ properly relied on Plaintiff's inconsistent activities to reject his credibility. (AR 33). These activities included volunteer work at a church, looking for work, doing household chores, cooking, shopping, going to the gym at times, attending AA meetings, traveling to Oregon for a wedding in August 2013, using a computer daily for a few hours, writing prose, doing laundry,

///

///

---

[3]  The ALJ also discounted Plaintiff's credibility because Plaintiff's father described Plaintiff as "lying" about his symptoms. (AR 34). Plaintiff argues that the ALJ parses Dr. Shank's statement that Plaintiff lies about his symptoms and construes it out of context. The Court agrees. Dr. Early reported that Dr. Shank stated Plaintiff "has been verbally abusing his mother, and has been out of control," Plaintiff is paranoid and "that the Hell's Angels are not against/out to get him," and Plaintiff "is lying about current symptoms, and may be manic and paranoid. I do not see current grounds for commitment on 5150." (AR 453). It appears that by "lying" Dr. Shank meant that Plaintiff falsely believed that Hell's Angels were out to get him. In context, it does not appear that Dr. Shank intended to convey that Plaintiff was lying about his symptoms of mania, depression, anxiety, or paranoia. The Court therefore agrees that the ALJ's reliance on Dr. Shank's statement to reject Plaintiff's credibility thus was not supported by substantial evidence. However, the remaining reasons given to reject Plaintiff's credibility are sufficient to affirm the ALJ's decision.

and using public transportation.  The ALJ characterized this daily activity level as "fairly normal" and "not as limited as one would expect from an individual with debilitating symptoms."  (AR 33, 34).

The Court already has determined that substantial evidence supported the ALJ's finding that these activities were inconsistent with Dr. Early's assessed limitations.  Supra §VII.A.2.b.  For the same reasons, they are inconsistent with Plaintiff's complaints of disabling symptoms.  The ALJ specifically determined that Plaintiff's activities translated into the ability to perform appropriate work activities.  (AR 33).  The ALJ's reliance on these activities thus constituted a specific, clear and convincing reason to discount Plaintiff's credibility.  Cf. Barnhart, 278 F.3d at 958-59 (ALJ properly relied on the inconsistencies between a plaintiff's complaints and daily activities in assessing credibility).

### 2.   Failure To Comply With Treatment

The ALJ concluded that Plaintiff's credibility was undermined by his failure to comply with prescribed medical treatment.  (AR 34).  The ALJ's findings were supported by substantial evidence.

The ALJ noted that Plaintiff stopped taking his lamictal or lowered the dose in September 2011.  In October 2011, Plaintiff's physician noted overuse of Klonopin and expressed concern that he was escalating the dose of Klonopin to a level that would produce

the risk of seizures upon withdrawal.  In July 2011, Plaintiff stopped his lamictal again on his own.  In December 2012, Plaintiff overused suboxone and tamezepam.  In August 2013, Plaintiff was trying to ration his use of Klonopin due to prior overuse.  In October 2013, Plaintiff admitted that he took too much valium.  (AR 34; see also AR 306 (in March 2009, Plaintiff consumed a one-month's supply of clonazepam in ten days); AR 307 (in April 2009, Plaintiff's doctor "again" counseled Plaintiff to limit his clonazepam intake); AR 451 (in August 2011, Plaintiff overused his Klonopin)).

Other evidence also supported the ALJ's finding that Plaintiff failed to comply with his medical treatment.  In August 2011, Plaintiff consented to using only certain medications and refused to take antipsychotics or mood stabilizers.  (AR 453).  In early 2012, at Cottage Hospital's residential treatment program, Plaintiff "deflected & denied & refused additional medications." (AR 354).

Substantial evidence in the record thus supported the ALJ's finding that Plaintiff failed to follow his prescribed course of treatment.  Accordingly, Plaintiff's non-compliance with his prescribed treatment constituted a specific and legitimate reason to reject his credibility.  Cf. Tommasetti, 533 F.3d at 1039.

///

///

///

///

### 3. Conservative And Effective Treatment

The ALJ also properly relied on Plaintiff's conservative and effective treatment to support her adverse credibility finding. (AR 34). The ALJ characterized Plaintiff's medical treatment as mainly conservative since December 2011. She also noted that Plaintiff denied side effects from his medications, and Plaintiff testified that his bipolar disorder and depressive symptoms now are controlled with medications. (AR 34, 33). The ALJ further found that Plaintiff's prescribed medications control his depressive symptoms as long as Plaintiff is not taking illicit drugs. (AR 33). These findings were supported by substantial evidence.

Plaintiff's physicians prescribed Klonopin and other medications to treat his symptoms of anxiety and his bipolar disorder. (AR 32, 34; see also AR 411, 414, 416, 435, 436, 442, 443, 445). As discussed above, the ALJ noted that Plaintiff reported doing well in February 2012, August 2012, January 2013, May 2013; being happy in June 2013; and feeling "really good" and "fantastic" after an adjustment in medication in September 2013. (AR 32). In March 2012, April 2012, May 2012, and January 2013, Plaintiff was "[r]esponding well" to his current treatment and "doing well overal[l]." (AR 401, 403, 402, 412). In April 2013, Plaintiff reported improvement in his social anxiety on Klonopin,
///
///
///

and by May 2013 he was doing well on his medication regime. (AR 32). In June 2013, the ALJ noted that Plaintiff reported that his social anxiety was less, and by October and November 2013, Plaintiff's bipolar disorder had improved and his mood and anxiety were stable. (AR 32-33).

In addition to this evidence, Plaintiff testified at the hearing that his health improved since he stopped using drugs and started "doing lots of yoga" and "sticking to a strict medical regimen with my psychiatrist and my therapist." (AR 62). He further confirmed that his physician's representation that he was "doing really well" was "definitely" true. (AR 66-67). Plaintiff further denied any side effects from his medication. (AR 63). Plaintiff also testified that, while his bipolar disorder is not fully controlled, he is "getting to a point where [he is] able to handle [his] symptoms better." (AR 69). Plaintiff attributed the improvement in his health to his sobriety and adhering to a strict medication regime. (AR 62, 65, 67). Plaintiff testified that his drug use impeded his ability to work and "to just function in general." (AR 73).

Plaintiff argues that his symptoms of depression wax and wane and that it was error for the ALJ to pick out a few isolated instances of improvement over a period of months. Cf. Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014). While Plaintiff contends that the ALJ's references to controlled depression are not supported by the record, (Pl's Mem. at 19), the Court's review of the record shows otherwise.

According to Plaintiff, Dr. Early indicates that Plaintiff continued to have depression during a period of abstinence. Plaintiff cites Dr. Early's notes from December 6, November 7, October 8, 9, and 16, September 14 and 10, August 31, August 6, and July 22, 2013, to support this claim. (Pl's Mem. at 18 (citing AR 428, 429, 431, 435, 436, 437, 439, 440)). Of the notes Plaintiff cites, however, only those from August 6 and September 10 reference depressed symptoms. (AR 436, 439). The remainder note Plaintiff's diagnosis of bipolar depression but do not report any active depressed symptoms. (AR 428, 429, 431, 435, 437, 440). Instead, they report a "good" mood and that Plaintiff is "doing well," (AR 428), a "good" mood and "euthymic" affect on two separate sessions, (AR 429, 440), a "fantastic" mood and "euthymic" affect, (AR 435), and a "pretty good" mood and "anxious but optimistic" affect, (AR 437). While Dr. Early reports a "low" mood and "depressed" affect on September 10, 2013, and a "somewhat low" mood and "anxious" depressed affect on August 6, 2013, as discussed below, these reports constitute isolated instances of depression that, viewed in the context of the entire record, do not alter the outcome. (AR 436, 439).

Admittedly, Dr. Early's notes also contain other references to depressed or negative symptoms. These instances, however, generally are susceptible to more than one rational interpretation, which precludes this Court from remanding. Reddick, 157 F.3d at 720-21 (when the evidence can reasonably support either affirming or reversing an ALJ's conclusion, the Court may not substitute its judgment for that of the Commissioner). Thus, for example, while

Dr. Early assessed a low mood and slightly depressed affect in November 2011, his notes also indicate that Plaintiff was "doing better overall." (AR 447). While Plaintiff was tearful and depressed in April 2013, Dr. Early noted that it was because Plaintiff's dog had been diagnosed with lymphoma. (AR 445). While Dr. Early assessed Plaintiff's affect as anxious and dysphoric in July 2013, he determined Plaintiff's mood was "[n]ot too bad" an opined that Plaintiff's bipolar symptoms were in fair control. (AR 441). In August 2013, Plaintiff's mood was "somewhat low" and his affect anxious and depressed, but Dr. Early assessed Plaintiff's general appearance and behavior as nonetheless motivated and open. (AR 439). In October 2013, while Plaintiff's therapist reported that Plaintiff might be a "little manic," and Dr. Early noted an elevated mood and mild increased rate of speech, he opined that this might be due to Plaintiff's new puppy. (AR 430).

Dr. Early's references to any anxious or depressed symptoms were balanced by competing references to positive symptoms and findings that were inconsistent with an overall assessment of a disabling condition. They also were inconsistent with Dr. Early's treatment notes as a whole, which generally indicated that Plaintiff was doing well and his symptoms were controlled by his medications. Substantial evidence therefore supported the ALJ's decision to discount Plaintiff's credibility. Accordingly, Plaintiff's conservative and effective treatment constituted a specific, clear and convincing reason for rejecting Plaintiff's credibility, cf. Parra, 481 F.3d at 750-51, and remand is not required.

### 4. Objective Medical Record

The ALJ determined that Plaintiff's testimony about his mental impairments was not entirely credible because the objective findings were inconsistent with that testimony. The ALJ reasoned that Dr. Guimaraes's treatment records indicate that in February 2012 Plaintiff reported he had been doing well since starting treatment at Cottage Hospital and assigned a GAF score of 60, which was indicative of moderate symptoms. The ALJ further noted that in May 2012 Plaintiff was responding well to treatment. In August 2012, Plaintiff "reported doing well" and having no complaints, and his "treating source indicated that this was the best he had been doing in awhile." In October 2012, Plaintiff's mental status exam was within normal limits. In January 2013, Plaintiff reported doing well overall. (AR 32).

Moreover, the ALJ noted that Dr. Early's treatment records indicated that Plaintiff reported improvement in his social anxiety on Klonopin. In May 2013, Plaintiff was doing well on his medication regime. In June 2013, Plaintiff stated "I'm definitely happy" and noted his social anxiety was less overall. In September 2013, although he presented with complaints of depression and problems sleeping, Plaintiff felt Klonopin worked better than Ativan for anxiety. Later, in September 2013, Plaintiff went back on Ambien, Saphris, and Klonopin and stated that he felt "really good now" and "fantastic." In October 2013, Plaintiff's bipolar disorder was improved. In November 2013, Plaintiff was stable with mood and anxiety. (AR 32-33).

The ALJ's findings are supported by substantial evidence. Supra § III.A.3, A.5. In treating Plaintiff, Dr. Guimaraes generally assigned GAF scores between 70 to 80 and even noted a past GAF for the prior year of 78.[4] Id. Moreover, Dr. Guimaraes noted that Plaintiff reported doing well in February 2012, in March 2012, in April 2012, in May 2012, at the beginning and end of August 2012, in October 2012, and in January 2013. Supra § III.A.5. Dr. Guimaraes consistently assessed Plaintiff with "good" memory and attention. Id. Importantly, Dr. Guimaraes repeatedly indicated throughout the course of his treatment – i.e., in March 2012, April 2012, May 2012, August 2012, October 2012, and January 2013 – that Plaintiff was responding well to his current treatment. Id. In early August 2012, Dr. Guimaraes noted that "this is the best [Plaintiff has] been doing in awhile." Id.

Moreover, although Dr. Guimaraes in one note referenced intermittent depression and in three others assessed an anxious mood, these were isolated instances. Most importantly, he assessed relatively high GAF scores of between 70 to 80. Supra § III.A.5. Thus, while Dr. Guimaraes three times assessed Plaintiff with an anxious mood, (AR 405, 415, 417 (assessing an anxious mood upon early discharge from Cottage Hospital's residential treatment program and in July and August 2012)), he nonetheless assigned GAF

---

[4] While he did assess a GAF score of 60 during Plaintiff's initial session, Plaintiff had just been discharged from Cottage Hospital's residential treatment program prior to completing the full program and had not complied with medication recommendations. Supra § VII.B.2. A. Moreover, while Dr. Guimaraes assessed a lower GAF of 50 in his September 2012 functional assessment, (AR 410), this score is wholly inconsistent with his other consistent scores assessed during treatment that fell between 70 to 80.

scores between 70 and 80 during all but Plaintiff's initial session.  Id.  Similarly, while Dr. Guimaraes noted an intermittently depressed mood in May 2012, Plaintiff himself reported feeling good and Dr. Guimaraes GAF score of 75 was high.  Id.

Finally, although Dr. Guimaraes completed a functional assessment in September 2012 opining that Plaintiff had marked or moderate work-related limitations and assigned a GAF score of 50, this score is wholly inconsistent with Dr. Guimaraes's consistent scores between 70 to 80.  Id.  The low GAF also is inconsistent with Dr. Guimaraes's mental status findings, including his repeated characterization of Plaintiff's mood, memory, and attention as good and his notations that Plaintiff was responding well to his current treatment.  It also is inconsistent with Plaintiff's self-reports of doing well throughout the course of his treatment.  Id.

Dr. Early's notes similarly refer to Plaintiff as doing well and suggest that Plaintiff's symptoms of depression were controlled with medication.  See supra § VII.B.3.  The ALJ, thus, properly supported her reliance on the inconsistent objective medical evidence with substantial evidence.  Cf. Burch, 400 F.3d at 680-81 (where the evidence is susceptible to more than one rational interpretation, the Court must uphold the decision).  Inconsistent objective medical evidence may serve as one factor among many detracting from the credibility of Plaintiff's subjective testimony.  Cf. Bray, 554 F.3d at 1227; Thomas, 278 F.3d at 958-60; Morgan, 169 F.3d at 599-600.  Therefore, remand is not required.

## C.    **The ALJ Did Not Err In Evaluating Lay Witness Statements**

Plaintiff contends that the ALJ erred in evaluating the lay witness statements of his mother Janice Lloyd, his father Dr. Paul Shank, his therapist Eti Valdez-Kaminsky, his brother law Paul Gerding, Jr., and family friend Deborah Heil. (Pl's Mem. at 19; Pl's Reply at 6). This claim lacks merit.

In determining whether a claimant is disabled, an ALJ must consider lay witness testimony regarding a claimant's ability to work. Stout, 454 F.3d at 1053. The ALJ may discount the testimony of lay witnesses only if she gives "reasons that are germane to each witness." Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). If an ALJ fails to expressly consider lay witness testimony, the court must determine whether the ALJ's decision remains legally valid, despite such error. Carmickle, 533 F.3d at 1162. If the ALJ's ultimate credibility determination and reasoning are adequately supported by substantial evidence in the record, no remand is required. Id. (citation omitted).

### 1.    **Janice Lloyd**

The ALJ did not fully credit the lay witness statement of Plaintiff's mother Janice Lloyd. (AR 34). The ALJ noted that Ms. Lloyd reported Plaintiff has no problems with personal care, prepares his own means, washes dishes, goes out alone, shops in stores, uses public transportation, takes care of his dog, and is capable of functioning when on his medications. (AR 34).

The ALJ discounted Ms. Lloyd's opinion regarding the severity of Plaintiff's symptoms, including her opinion that Plaintiff cannot "hold down a job." (AR 263-64). The ALJ reasoned that Ms. Lloyd had a "familial motivation" to support Plaintiff and a "financial interest in seeing [Plaintiff] receive benefits in order to increase the household income since [Plaintiff] was living with her at the time she completed [her written statement]." (AR 34)

The testimony of a lay witness generally should not be rejected solely because he is a family member. Smolen, 80 F.3d at 1289 (the fact that a lay witness is a family member cannot be a ground for rejecting his testimony); Valentine v. Comm'r of Soc. Sec., 574 F.3d 685, 694 (9th Cir. 2009) (same). The ALJ, however, also noted that Ms. Lloyd had a financial interest in her son's receipt of disability benefits. (AR 34). "[E]vidence that a specific spouse exaggerated a claimant's symptoms in order to get access to his disability benefits, as opposed to being an 'interested party in the abstract,' might suffice to reject that spouse's testimony." Valentine, 574 F.3d at 694. Here, the ALJ did not find Ms. Lloyd exaggerated Plaintiff's symptoms for the purpose of getting access to his disability benefits. Nor did any evidence in the record suggest that Ms. Lloyd exaggerated her statements for this purpose. Thus, the fact that Ms. Lloyd is Plaintiff's mother and had a financial interest in Plaintiff's receipt of benefits at the time of her statements is not a proper reason for rejecting her testimony.

Even if the ALJ erred, however, in rejecting Ms. Lloyd's testimony on this ground, the error was harmless. Ms. Lloyd's testimony was cumulative of Plaintiff's own testimony, and the ALJ properly rejected Plaintiff's testimony. Supra § VII.B. These reasons apply equally to Ms. Lloyd's statements. The Court, therefore, confidently concludes that no reasonable ALJ would have reached a different decision based upon this evidence. Cf. Stout, 454 F.3d at 1056 ("[Where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different determination."). Thus, any error by the ALJ did not materially impact the ALJ's decision and was harmless. Accordingly, remand is not required.

**2. Dr. Paul Shank**

Dr. Shank stated that Plaintiff has an inability to socialize and to retain relationships, does not interact well even with family, has extreme fear – not based in reality – of being followed by Hell's Angeles, drug dealers and others, has a phobia about the way he interacts with people has extreme situational anxiety at the slightest interaction and barrages strangers inappropriately with expletives. (AR 454). The ALJ rejected Dr. Shank's statements because (1) it was not clear what type of physician Dr. Shank is; (2) Dr. Shank's opinion was less objective than the opinions of other medical providers because he is Plaintiff's father; (3) it was not clear how often Dr. Shank saw Plaintiff; and (4) Dr. Shank's

statements were based mainly on Plaintiff's subjective statements. (AR 34-35). Plaintiff contends that the ALJ improperly evaluated these statements because the ALJ treated Dr. Shank's statements as a medical, not lay, opinion. (Pl's Mem. at 21-22).

The ALJ needed only to cite a germane reason to reject Dr. Shank's statements. That Dr. Shank's opinions were based largely on Plaintiff's discredited self-reported symptoms is a germane reason sufficient to support the ALJ's decision. Even if, however, the ALJ had erred, the error was harmless for the same reasons any error with respect to improperly considering Ms. Lloyd's statements were harmless. Accordingly, remand is not necessary.

### 3. Eti Valdez-Kaminsky, MFT

The ALJ discounted the opinion of his therapist Eti Valdez-Kaminsky, MFT. While Plaintiff characterizes his therapist's testimony as "lay witness testimony," the Court does not necessarily find that a therapist is the equivalent of a "lay witness." However, for purposes of evaluating the ALJ's decision, the distinction is not material. Whether Valdez-Kaminsky is considered a medical source or a lay witness, the ALJ provided specific and legitimate reasons to reject the therapist's opinions.

Valdez-Kaminsky assessed marked restrictions in daily activities; social activities; maintaining concentration, persistence, and pace; dealing with the public; understanding, remembering, following, and carrying out complex instructions;

behaving in an emotionally stable manner; and relating predictably in social situations. Valdez-Kaminsky assessed a GAF score of 44. (AR 455). The ALJ characterized Valdez-Kaminsky as opining that Plaintiff "essentially . . . was unable to work." (AR 36).

The ALJ gave little to no weight to Valdez-Kaminsky's opinion because the therapist was not an acceptable medical source. (AR 36). The ALJ also found that the opinion was not supported by the medical record and the therapist's own treatment notes. (AR 36-37). The ALJ further found that the RFC's limitation to simple unskilled work accommodated Valdez-Kaminsky's opinion that Plaintiff was markedly limited in the areas of detailed work, attention, and concentration. (AR 37).

Plaintiff concedes that Valdez-Kaminsky is not an acceptable medical source, but maintains that he provided relevant lay witness testimony. (Pl's Mem. at 20 (citing SSR 06-3p)). "Inconsistency with medical evidence" is a valid and germane reason for discounting lay witness testimony. Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005). Here, the ALJ noted that Valdez-Kaminksy's opinion was "unsupported by the medical record, including the claimant's treatment notes, which indicate no allegations pertaining to many of [the therapist's] opined limitations." (AR 36-37; AR 418, 455-57).

For example, Valdez-Kaminsky deemed Plaintiff markedly impaired in his ability to maintain attention and concentration, yet on examination Plaintiff had fair to good attention and

57

concentration. (AR 312, 314, 414-17). Valdez-Kaminsky opined that Plaintiff was mildly to moderately impaired in his ability to use public transportation and shop for groceries alone, (AR 36; AR 456), yet both Plaintiff and his mother acknowledged that he could go out alone, use public transportation (almost daily), and grocery shop. (AR 74, 77, 261). Valdez-Kaminsky further opined that Plaintiff was moderately impaired in his ability to care for his personal hygiene and maintain a clean residence, yet Plaintiff testified that he could perform household chores, keep things organized, and independently dress and groom. (AR 73, 383). In fact, on examination, providers repeatedly described Plaintiff as neatly, appropriately, or well groomed. (AR 312, 314, 352, 383, 414, 416). Because the ALJ noted inconsistencies between Valdez-Kaminsky's opinions and the medical and other record evidence, (AR 36-37), she provided a valid and germane reason for discounting the therapist's opinion. Cf. Parra, 481 F.3d at 750. Remand, therefore, is not warranted.

### 4. Paul Gerding, Jr. And Deborah Heil

Plaintiff contends that the ALJ erred when he failed to discuss the statements of Paul Gerding, Jr., Plaintiff's brother-in-law, and Deborah Heil, a family friend. (Pl's Mem. at 23-24). Mr. Gerding stated that Plaintiff has outbursts, sometimes could not get out of bed, and has great trouble organizing and remembering the demands of life on a day-to-day basis. (AR 292-93). Ms. Heil stated that Plaintiff was forgetful, distractible, and sometimes nervous; was socially withdrawn; suffered from odd thinking; had

difficulty making and keeping friends and lacked a solid peer ground; had different moods, anger outbursts, and illogical rants; was intolerant of others; and had poor concentration.  (AR 291).

"[C]ompetent lay witness testimony 'cannot be disregarded without comment.'"  Molina v. Astrue, 674 F.3d at 1114 (quoting Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)).  The ALJ, however, need not discuss every witness's testimony on an individualized, witness-by-witness basis.  Id.  "Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."  Id. (citing Valentine, 574 F.3d at 694).  At a minimum, the ALJ must acknowledge reviewing the lay witness testimony and provide "her reasons for disregarding the lay witness testimony, either individually or in the aggregate."  Id.

The ALJ did not evaluate Mr. Gerding's or Ms. Heil's statements.  Contrary to Plaintiff's claim, however, the ALJ did not commit per se error.  Cf. id.  Harmless error analysis applies.  Id. ("Where lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with our prior harmless error precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se.") (citations omitted).

Mr. Gerding's and Ms. Heil's statements did not describe any limitations not already described by Plaintiff and Valdez-Kaminsky. (AR 258-65, 292-94, 418, 454, 455-57). The ALJ rejected Plaintiff's statements because of Plaintiff's activities, effective conservative treatment, and the medical record. Supra § VII.B.1, B.3, B.4. The ALJ rejected Valdez-Kaminsky's statements because they were inconsistent with the objective medical and other record evidence. Supra § VII.C.3. These reasons are equally applicable to the statements of Mr. Gerding and Ms. Heil. Therefore, the Court confidently concludes that no reasonable ALJ would have reached a different decision based upon the evidence. Cf. Stout, 454 F.3d at 1056. Accordingly, the error was harmless and remand is not required.

**D.    The ALJ Did Not Err In Determining Plaintiff's RFC**

Plaintiff claims that the ALJ failed properly to assess Plaintiff's RFC. Plaintiff contends that, "by improperly rejecting the opinions of Drs. Early and DiGiaro, as well as the lay witness information, the ALJ fails to address all of [Plaintiff's] impairments or limitations in formulating the RFC." (Pl's Mem. at 24). The Court disagrees.

Social Security Ruling 96-8p defines a claimant's RFC as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p. The term "regular and continuing basis" is further defined as meaning "8 hours a day, for 5 days a

week, or an equivalent work schedule." Id. RFC is an administrative finding left to the Commissioner. See SSR 96-8p; 20 C.F.R. § 416.946 (ALJ, not a doctor, is responsible for assessing RFC); Vertigan v. Halter, 260 F. 3d 1044, 1049 (9th Cir. 2001) ("It is clear that it is the responsibility of the ALJ, not the claimant's physician to determine [RFC]."). The ALJ must base his RFC finding on his analysis of the record as a whole, not on the opinion of a single physician. See SSR 96-8p. A court will affirm an ALJ's RFC if it is supported by substantial evidence and the ALJ properly applies the legal standard. Bayliss, 427 F.3d at 1217. That a claimant would have interpreted the record differently does not impugn the ALJ's reasoning. See Tommasetti, 533 F.3d at 1038 (an appellate court will only disturb the Commissioner's decision if it contains legal error or is not supported by substantial evidence).

Here, the ALJ determined that Plaintiff possessed the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: Plaintiff "can do simple, routine, repetitive tasks and some detailed ones, not involving work with the public," and "can do work involving a low level of pressure in terms of strict deadlines." (AR 31). The ALJ based this determination on the opinions of Dr. DiGiaro and Brooks, Plaintiff's activities, and the overall medical and record evidence. (AR 35, 37). The ALJ's RFC was supported by substantial evidence.

Drs. DiGiaro and Brooks opined that Plaintiff could perform simple, repetitive tasks and could accept instructions from supervisors and interact with coworkers. (AR 37; AR 129, 131, 385). The ALJ incorporated Dr. DiGiaro's opinion that Plaintiff had a severe impairment in dealing with work stress by limiting Plaintiff to "low level of pressure in terms of strict deadlines." (AR 31; AR 385). Importantly, the ALJ's RFC finding was also supported by Plaintiff's objective medical records, which as a whole indicated that Plaintiff's condition generally resolved when he complied with his physicians' treatment recommendations. (AR 32); supra § VII.B.3, 4. Moreover, Plaintiff acknowledged engaging in activities, some of which the ALJ determined were necessary to obtain and maintain employment, that were inconsistent with a claim of disability and consistent with the ALJ's RFC. (AR 33); supra § VII.B.1. Finally, the ALJ properly rejected the more restrictive opinions of Dr. Early and discounted the credibility of Plaintiff's statements describing more restrictive limitations. (AR 32-34, 36); supra § VII.A.2 and B.

Admittedly, the ALJ's RFC did not contain the limitations identified by Dr. Early or certain limitations identified by Dr. DiGiaro. The Ninth Circuit has repeatedly held, however, that, in determining the RFC, an ALJ is not required to incorporate evidence from physicians when the ALJ previously and permissibly discounted that evidence. Chaudhry, 688 F.3d at 671 ("because the ALJ provided specific and legitimate reasons supported by substantial evidence to give less weight to [the examining physician's] opinion, we conclude that the ALJ did not err in basing the RFC on [the DDS

nonexamining physician's] findings rather than [the examiner's]");

Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1197 (9th Cir. 2004)

(in determining RFC, the "ALJ was not required to incorporate

evidence from the opinions of [the claimant's] treating physicians,

which were permissibly discounted"). Because the ALJ properly

rejected the severe limitations opined by Drs. Early and DiGiaro,

he did not err in excluding those limitations from the RFC.

     For these reasons, the ALJ did not err in formulating the RFC.

The ALJ applied the proper legal standard and the RFC was supported

by substantial evidence.  Accordingly, remand is not appropriate.

**E.    The ALJ Did Not Err At Step Five**

     Plaintiff contends that the ALJ gave an incomplete

hypothetical to the vocational expert ("VE").  An ALJ may properly

rely on the testimony of a VE where the ALJ poses a hypothetical

"contain[ing] all the limitations the ALJ found credible and

supported by substantial evidence in the record."  Bayliss, 427

F.3d at 1217; see also Valentine, 574 F.3d at 690 ("The hypothetical

an ALJ poses to a vocational expert, which derives from the RFC,

must set out all the limitations and restrictions of the particular

claimant.") (internal quotation marks omitted).  The ALJ, however,

is not required to include limitations for which there was no

substantial evidence.  Osenbrock, 240 F.3d at 1164-65 ("An ALJ is

free to accept or reject restrictions in a hypothetical question

that are not supported by substantial evidence.").  The omitted

limitations were those that the ALJ found did not exist.  The ALJ

included all of the limitations that he found to exist, and his findings were supported by substantial evidence.  The ALJ thus did not err in omitting the other limitations Plaintiff claimed, but failed to prove.  <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001).  Accordingly, remand is not warranted.

## VIII.

### CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner.  The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED:  June 9, 2017

                                        /S/
                              SUZANNE H. SEGAL
                              UNITED STATES MAGISTRATE JUDGE

### NOTICE

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS/NEXIS, WESTLAW OR ANY OTHER LEGAL DATABASE.**